STROMBERG MOTOR DEVICES CO. v. ZENITH CARBURETOR CO.

ZENITH CARBURETOR CO. v. STROMBERG MOTOR DEVICES CO.

(Circuit Court of Appeals, Seventh Circuit. September 14, 1918. Rehearing Denied November 19, 1918.)

Nos. 2234, 2247.

1. PATENTS ⬅168(2)—REJECTION OF CLAIMS—ACQUIESCENCE.

The owner of a patent has no standing to sue upon a canceled claim or seek a construction of an allowed claim which would in effect revive a canceled claim, but the acquiescence of the patentee in the rejection of one claim cannot be given a retroactive effect upon the negotiation leading up to the allowance of the other claims, so as to narrow those claims to less than they were entitled to at the time of their allowance.

2. PATENTS ⬅239—IMPROVEMENT PATENTS—INFRINGEMENT.

Where a later patentee, who obviated another objection to an old device, added to his independent solution a device already patented, but which did not solve the objection solved by the later patentee, such patentee infringed the earlier patent.

3. PATENTS ⬅328—CONSTRUCTION—VALIDITY AND INFRINGEMENT.

The Ahara patent, No. 684,662, claims 1, 2, 4, 5, and 7, for a carburetor for explosive engines which was novel in providing a U-shaped auxiliary well, *held* valid, and infringed by defendant's Exhibits 1 and 10 as well as Exhibit 2.

4. PATENTS ⬅165—PROTECTION TO PATENTEE.

A patentee is entitled to all the benefits of his invention, whether he apprehends and states them or not, and must be given full protection in his claims, whether he has explained the theory of the operation of his device correctly or not, being entitled, against an infringer, to a range of equivalency commensurate with his actual contribution to the art.

5. PATENTS ⬅177—CLAIMS—COMBINATION CLAIMS.

A combination claim must of course be treated as an integer, for its novelty may consist wholly in bringing together old elements.

6. PATENTS ⬅328—CONSTRUCTION—INFRINGEMENT.

The Richard patent No. 791,501, claims 8, 10, and 11, for an explosion engine consisting of a carbureting chamber, a U-shaped receptacle connected with the storage reservoir, etc., *held*, in view of the prior art, not infringed by defendant's carburetors.

7. PATENTS ⬅328—CONSTRUCTION—INFRINGEMENT.

The Sturtevant reissue patent No. 12,611, for a double carburetor for explosive engines, claim 1, *held* not infringed.

8. PATENTS ⬅328—CONSTRUCTION—INFRINGEMENT.

The Anderson patent, No. 1,063,148, claim 1, for a carburetor, a carbureting chamber, a fuel jet, an auxiliary reservoir, etc., *held* not infringed, if conceded valid.

9. PATENTS ⬅157(1)—CONSTRUCTION—ELEMENTS OF COMBINATION.

An element of a combination, described in the same words in each of two claims of a patent, must be taken to refer to the same thing in both claims.

Appeal and Cross-Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Suit by the Stromberg Motor Devices Company against the Zenith Carburetor Company. From a decree in part for complainant (220 Fed. 154), complainant appeals, and defendant cross-appeals. Remanded, with directions. See, also, 254 Fed. 91.

Charles A. Brown, of Chicago, Ill., and William H. Kenyon, of New York City, for Stromberg Motor Devices Co.

Clarence P. Byrnes, of Pittsburgh, Pa., and William M. Swan, of Detroit, Mich., for Zenith Carburetor Co.

Before BAKER, MACK, and EVANS, Circuit Judges.

BAKER, Circuit Judge.   Stromberg Company sued Zenith Company for alleged infringement of four patents on carburetors for internal-combustion engines.

Claims 1, 2, 4, 5, and 7 of patent No. 684,662, October 15, 1901, to Ahara, and claims 8, 10, and 11 of patent No. 791,501, June 6, 1905, to Richard, were held valid and infringed by Zenith carburetors identified as Exhibits 1 and 10, but not infringed by Exhibit 2.

Claim 1 of patent No. 1,063,148, May 27, 1913, to Anderson, and claim 1 of reissue patent No. 12,611, February 19, 1907, to Sturtevant, were held valid, but not infringed by any Zenith device.

Each company assigns error on those parts of the decree that are adverse to its contentions.

## I. Ahara.

[1-3] "Feeder for explosive engines," namely, a carburetor, is the subject-matter of the patent.   No improvement of explosive engines in kind or degree was contemplated or involved.   "This invention," Ahara said, "relates particularly to a structure adapted to vary the amount of fuel mixed with air fed to such an engine"; that is, an explosive engine.   He pictured and described in detail the adaptability of his carburetor to vary the amount of fuel to correlate properly with the air conditions, both as to quantity and heat, in a one-cylinder work engine in which the desired uniformity of speed is obtained within fairly close limits by the automatic action of a governor in holding the intake valve shut and the exhaust valve open during one or more of the four-cycle periods of operation.   But he also declared that "changes in details of construction to adapt the device to other types of explosive engines are obvious and within ordinary mechanical skill."   Of course his saying so does not make it so.   But in connection with the general statement of the nature and object of the invention it demonstrates that Ahara's inventive concept covered a carburetor, not an improved one-cylinder work engine, and that he intended to claim, though unnecessarily, all uses to which his carburetor could be put.

In giving the operation of his carburetor when applied to a one cylinder hit-and-miss engine, he illustrated and described three styles of construction; but, as they all operate in the same way, it will suffice if we follow through one type.

"Referring to Fig. 1, the letter A indicates the casing forming a part of an engine, which is provided with an aperture A1, controlled by a valve A2 at the inlet-port for the cylinder of an explosive-engine, and communicates with the main air-inlet passage A4 of the engine.   This valve A2 is ordinarily closed by any desired means—for instance, a spring A3—and is opened by the suction of the engine-piston in moving away from the valve, so as to draw inward the explosive mixture composed of fuel and air, while in the return movement of the piston the valve is closed and the mixture placed under compression, as is well known in this art.   In Fig. 1 I have shown at B a casing comprising the feeding device, which is formed at its upper por-

tion with a fuel-reservoir B¹, having a discharge opening B² below the fuel-level therein and valve-controlled port B³, from which port a feed-tube B⁴ extends upward into the space or passage adjacent to the inlet-opening A¹. Any preferred construction of valve may be used in this connection; but I have shown in the present instance a needle-valve C, adjusted by means of a threaded portion C¹, and provided at its outer edge with a handle C², while the stem of said valve passes through a packing-sleeve C³, secured to the casing B in any desired manner. In the form of the invention shown in Fig. 1 there is provided a collecting passage or chamber D, having one end communicating with the atmosphere above the fuel-level of the reservoir, and the other end extending downward to the lower portions of the casing B, and thence upward upon an inclined plane, as shown at D¹, where it communicates with a feed-tube D², extending parallel to and in contact with the fuel-tube B⁴, which tube is provided with an opening B⁵, communicating with the feed-tube D². It will thus be seen that when the valve is set to permit the continuous flow of any desired quantity of fuel at each suction-stroke of the engine this amount would pass into the fuel-tube B⁴, and be drawn upward with the proper amount of air to effect the explosive mixture for use in the engine, while if the feed of fuel be omitted or cut out the fuel continues to flow into the tube B⁴, and not being drawn upward by suction into the cylinder, flows through the aperture B⁵ downward into the inclined portion D¹ of the passage D. Sufficient fuel will collect in this passage, depending upon the time interval between the suction-strokes of the engine, so that when the next charge of fuel is drawn into the engine an excess of fuel in proportion to the air is secured sufficient to compensate for the cooling of the cylinder and the air which may be therein, and thus produces an explosive action equal in character with the regular action of the engine.

"The fuel in the reservoir B¹ is maintained at a predetermined level by any desired means."

Claims 1 and 2 are enough to consider in determining all the essential points of dispute: .

"1. A feeder for explosive-engines comprising a fuel-reservoir having a feed-outlet below the fuel-level therein to effect a continuous feed, a passage communicating with the atmosphere and with said outlet from said reservoir to receive fuel therefrom, and means adapted to control the communication between said reservoir and said passage, substantially as specified."

"2. A feeder for explosive-engines comprising a casing having a reservoir at its upper portion, a passage below said reservoir communicating with the atmosphere, a fuel-passage extending from below the fuel-level of said reservoir to said first-named passage, and means for regulating the capacity of a normally open port to control the flow of fuel through said fuel-passage, substantially as specified."

Crossley's British patent No. 24,584, December 21, 1893, is the main reliance for overthrowing Ahara. Counsel and experts contend interminably concerning the nature and capacity of the Crossley device, the meaning of certain suggested, but unillustrated, substitutions of parts, and particularly whether the alternative constructions, as each side conceives them to be, would work. We have fully considered all these disputes; but find it unnecessary to state them in detail, because our entire answer is given by considering the Crossley patent, and by placing above the various parts of the provisional and of the complete specification headings that in our judgment indicate the classifications Crossley had in mind.

From the provisional specification:

### General Statement.

"Our invention is for the purpose of measuring the quantity of oil required for each working stroke of such oil engines as in governing take a charge or

none in the well-known way. It consists of a chamber into which the oil is delivered of a certain definite capacity, this chamber being the proper size to hold the maximum quantity of oil required for one working stroke, and being emptied by the suction of the engine piston at each charging stroke."

### Large Engine.

"There are some conditions under which the quantity of oil per working or charging stroke requires modification to give the best results, as, for instance, an engine working at maximum load, and thus giving working strokes as frequently as possible, requires a definite amount of oil to give the best result. Should, however, the load decrease so as to cause the governor to miss out one or more working strokes in succession, a slight increase in the amount of oil delivered into the engine to form the next working stroke gives a better result · than without such increase.

"We obtain this increased amount in the following manner: A pump is arranged to deliver at the necessary intervals the best quantity for each working stroke when working at maximum load; this quantity being delivered into the measuring chamber, and, owing to the special form given to the measure, is drawn into the vaporiser by the piston of the engine during each suction stroke. The total capacity of the measuring chamber, however, is somewhat larger than the volume of this full-power oil charge, so that, when a working stroke has been cut out by the governor, the pump, which still continues delivering its definite quantity, delivers a second charge—or more charges—into the measuring chamber, which, owing to its greater capacity, retains a slightly increased amount for delivery to the engine the next time a working stroke is required, the excess overflowing and returning to the oil receptacle."

### Small Engine.

"In a modification of our invention, more especially applicable to smaller engines, in which it may not be necessary to give more than one measured oil charge, the measuring chamber may be made of a suitable size to give the definite amount of oil required, the pump, however, being made to throw a larger volume, and the surplus which thus overflows at each delivery of the pump may be carried to supply a lamp or for any other desired purpose, or may simply pass back to the oil tank."

### Non-Return Valve for Both Engines.

"Between the measuring chamber and the vaporiser in most instances it is desirable to place a light non-return valve, which opens during the suction stroke of the engine, allows the oil to be sucked in past it more or less mixed with and followed by a current of air, which thus sweeps the contents of the chamber out, and ensures it being carried through into the vaporiser and thence into the engine."

### Preferred Form of Measurer for Both Engines.

"By preference the form given to the measurer is that of a U with very short legs, and the supply from the pump is delivered into the lower part of it from beneath."

### Small Engine.

"When the measurer is used for giving one fixed charge only whether the engine be running at light or full load, it may be filled from a vessel placed above it instead of by a pump. A regulated quantity is thus allowed to flow into the U—the surplus passing, as in the case of the pump, either to feed the lamp or to a receptacle below. A bird-cage fountain arrangement may take the place of the overhead vessel so as to dispense with a constant flow to the measurer or any overflow therefrom. A float designed so as to give a constant level may be used instead of the bird-cage fountain."

That ends the provisional specification.
From the complete specification:

### General Statement.

Same as in the provisional specification.

### Large Engine.

After explaining as before the desirability of an increase of fuel after a nonsuction stroke, Crossley gives the details of construction by reference to drawings, which are part of the complete specification only, as follows:

"To enable our invention to be better understood, we append a sheet of drawings in which Fig. 1 is an end elevation, Fig. 2 is a side elevation, Fig. 3 is an end elevation of a modified form, Fig. 4 is a side elevation of the same.

"In Figs. 1 and 2, 'A' represents the chamber or oil measurer, in this instance consisting of a straight drilled hole, 'B' is the pipe from the oil-pump delivery, and 'C' is the automatic valve hereinafter referred to, 'D' is a passage into the vaporiser. In Figs. 3 and 4, 'E' is the chamber or oil measurer, 'F' is the pipe for the pump delivery, 'G' is the automatic valve, and 'H' is the passage to the vaporiser.

"In connection with the measure shown in Figs. 1 and 2 a pump is arranged to deliver at the necessary intervals the best quantity of oil for each working stroke, when working at maximum load: this quantity being delivered into the measuring chamber 'A,' and, owing to the special form of this chamber, drawn into the vaporiser by the piston of the engine during each vapor charging stroke through the passage 'D' and the automatic valve 'C.' The total capacity of the measuring chamber 'A,' however, is somewhat larger than the volume of this full-power oil charge, so that when a working stroke has been cut out by the governor the pump, which still continues delivering its definite quantity, delivers the second charge—or more charges—into the measuring chamber 'A,' which, owing to its greater capacity, retains a slightly increased amount for delivery to the engine the next time a working stroke is required, the excess overflowing into the cup shaped receiver 'I,' and returning to the oil receptacle through the overflow pipe 'K'."

### Small Engine.

Crossley brings forward from the provisional specification the first portion that relates to the small engine, but wholly omits the second portion, which contains the suggestions of substitutions for the pump.

### Nonreturn Valve for Both Engines.

"Between the measuring chamber and the vaporiser, in most instances, it is desirable to place the light nonreturn valve 'C,' which opens during the suction stroke of the engine, and allows the oil to be sucked in past it more or less mixed with and followed by a current of air, which thus sweeps the contents of the chamber out through 'H' or 'D,' and insures it being carried through into the vaporiser and thence into the engine."

### Preferred Form of Measurer for Both Engines.

"By preference in some instances we form the measuring chamber 'E' as shown in Figs. 3 and 4, the form given being that of a U or V with very short legs. The oil may be delivered into the lower part of it from beneath at the junction of the two short legs."

### Large Engine.

"Or, as shown in the drawings, may be delivered into the mouth of one of the legs through 'F.' By thus forming the measurer 'E' the oil flows with a certain amount of momentum into the mouth of one of the legs of the measuring chamber 'E,' this momentum given to the oil causes it to spill over out of the mouth of the other leg, so that though an excess amount of oil may be pumped into the measurer 'E' the oil does not quite fill the measurer 'E,' but the quantity contained in it is sufficient for normal working strokes. If the governor cut out working strokes, a second pump delivery of oil takes place into the measurer 'E.' This measurer, however, being more or less filled with oil, the new charge does not cause so much disturbance in it, and after its delivery the measurer is fuller than it was before, thus giving the slightly increased amount of oil desirable to give a working stroke following an idle stroke or strokes. Working in this manner, there is still a surplus of oil to flow over into the overflow cup 'L,' and pass away by the pipe 'M' to supply a lamp or for any other purpose."

That ends the complete specification.

It is only the large Crossley engine that has any provision of means for increasing the amount of fuel after a nonsuction stroke. Therefore the large Crossley engine is the only structure in this British patent that has any pertinency to the Ahara invention. In the large Crossley engine a pump and a measuring cup capable of holding a little more than one pump-stroke of liquid fuel are the means. None other is described, or even suggested. Referring to Ahara's drawing and description, we find that the means of varying the amount of fuel to correlate with quantity and heat conditions of air in the engine are a constant-level reservoir $B^1$; a gravity feed leading through the opening $B^2$, past controllable port $B^3$, and ending at $B^4$ within the intake or manifold of the engine with which the carburetor is associated; a valve C to control port $B^3$; an auxiliary well, namely, the U-shaped tube $D\ D^1D^2$, the upright portion D communicating with the atmosphere above the fuel-level of the reservoir, the lower portion $D^1$ lying beneath the gravity fuel-feed, and the upright portion $D^2$ terminating within the intake or manifold of the engine at a point above the fuel-level of the reservoir; and an aperture $B^5$ permitting the fuel to flow from the gravity feed into the auxiliary well. Upon this disclosure of means Ahara laid his broad claims in suit. Claims 1 and 2, which we have recited, generically cover vital combinations that work in accordance with the Ahara principle. With respect to the other claims in suit, not copied herein, our judgment is the same. Not only is it impossible to derive the Ahara device and claims from the Crossley patent on account of clear differences in means, but Ahara also achieved an improved and enlarged result. In a running engine of the hit-and-miss type periods of nonsuction, and in the multicylindered type, wherein suction is continuous but varied in amount by a manually operated throttle valve, periods of low suction are to be met and provided for. If feeding a running engine with an auxiliary supply of fuel, available immediately after a period of nonsuction or low suction,

be taken as the genus, Crossley's and Ahara's desires for results were akin; but in species their achievements were distant cousins. Crossley's measuring cup was sized to hold the proper supply of oil for one' explosion of a hit-and-miss engine running at a predetermined speed, and to hold an additional amount that was relatively slight. One pump-stroke furnished the normal quantity. If by the lessening of the load the predetermined speed of the engine should increase so that the governor would cut out a working stroke, the pump would discharge another pump-stroke of oil into the measuring cup; but the addition to the amount already in the cup would be less than one pump-stroke of oil, because Crossley mentions an excess overflowing the cup and returning to the receptacle with which the pump is connected. Now suppose that the governor, due to a greater fall in load, should cut out a succession of working strokes of the engine. It is obvious that after the first cut-out there would be no increase of fuel to correlate with the increased change of quantity and heat conditions of air in the engine. On the other hand, if the cup were enlarged to satisfy conditions after a succession of cut-outs, it would supply a hostile excess after one cut-out, because the cup is completely emptied by each suction stroke, and any excess of fuel tends to choke the engine. It is apparent, too, that Crossley's carburetor, whose measuring cup is emptied by each suction stroke, would not do very well on a multicylindered, hand-throttle-controlled, automobile engine, wherein the continuous suction must have wide variations in tensity. At best it would provide only that narrow range of speed which would come from holding the throttle to measure the air to correspond with the strictly measured oil, because revolution of the crank-shaft, not suction within the manifold, controls the delivery capacity of the pump. Turn now to Ahara. It is evident that suction at $B^4$ may be so tense as to limit greatly, if not to stop entirely, the flow into the auxiliary well through the aperture $B^5$. The result in degree is a matter of proportioning the parts, left to the ordinary judgment and mechanical skill of carburetor makers. If the Ahara carburetor is attached to a hit-and-miss engine, the duration of nonsuction periods is important. If one cut-out occurs, there is time for some fuel to collect in the auxiliary well; if a succession of cut-outs, more time for more fuel. If the nonsuction period is long, as in a dead engine (and this applies to both hit-and-miss and hand-throttle-controlled engines), there is time for the auxiliary well to fill up to the fuel-level of the reservoir. With a running hand-throttle-controlled engine, both the duration and the tensity of low-suction periods are important. Suction may be so high that little fuel or none flows into the auxiliary well. At varying time and tensity degrees of lower suction, correlatively varying amounts of fuel accumulate in the auxiliary well. In starting, suddenly going from no suction to suction, and in picking-up, suddenly going from low suction to high, an excess of fuel in proportion to air is needed; needed on account of the relatively lower temperature in the engine (which is a heat engine) and the lag of the fuel behind the air, due to greater density of fuel than that of air. So in these important operations of starting and of picking-up the Ahara auxiliary well stands ready to meet and satisfy the varying heat and air condi-

tions of the engine. And only in the limited sense that the size of the well and of the openings in connection with it must be proportioned to the demands upon it (as must other parts of the carburetor, and indeed, of the entire engine and automobile) is it true that the Ahara auxiliary well is a "measurer." Crossley was strictly that.

Crossley's and our statement of his patent eliminates his feeder for the small engine, in which there is never an increment of fuel. But in finally dismissing Crossley it may be permissible to note, in connection with the alternative constructions of the feeder for the small engine, (1) that both the large engine and the small will work when the measuring cup is fed by a pump; (2) that in the small engine, wherein the cup is completely filled in advance of each suction stroke, a constant-level reservoir may be substituted for the pump if the fuel-lever in the reservoir is kept at the level of the brim of the cup; (3) that in the large engine, though a constant-level reservoir may be substituted if the fuel-level in the reservoir is kept at the level of a line on the cup that marks one pump-stroke of fuel, we do not perceive how the constant-level can raise itself to supply the increment that distinguishes the operation of the large engine. At least Crossley did not show how; and we are not concerned with the nunc pro tunc products of the creative imagination of counsel and experts.

Only one other prior art reference need be noticed. Banki's patent, No. 595,552, December 14, 1897, was for a gasoline motor. It detailed and claimed improvements in methods of ignition and air control that are irrelevant. One suggestion relating to the carburetor is relied on. A constant-level reservoir feeding a single aspirating jet, typified in Ahara minus the auxiliary well, was used. The tip of the upright nozzle flared like a V. From above, down through the casing of the carburetor, came a screw whose conical point extended within the flaring nozzle. The screw was adjustable to control the amount of gasoline that could be sucked from the nozzle. The suggestion relied on is that the screw "may be provided with a central longitudinal boring through which air may be sucked in during the period of suction, whereby a complete dispersion of the gasoline will result." That is, if the needle of a needle-valve within an aspirating nozzle is hollow, the air coming through the hollow needle will aid in the atomization of the gasoline. No words of Banki's indicate that he ever dreamed of an auxiliary well like Ahara's as part of a carburetor. From Banki's drawings one may read that, when the engine is at rest, the gasoline from the constant-level reservoir would stand near the top of the nozzle; that one-fourth of the conical point of the needle would dip into the gasoline; that the gasoline would rise and stand within the hollow to that extent; and that, when the engine is started, the gasoline in the point of the needle would be sucked out so that the air through the hollow needle might perform its service in aiding atomization. This is claimed to be a clear and definite anticipation of Ahara's auxiliary well. Not only is Ahara's combination of means a stranger to Banki, there being, for example, no passage like Ahara's $B^5$ leading through the wall of the gravity feed into the hollow needle (the supposed auxiliary well), but the presence of gasoline in the tip of the conical point of the needle was an insignificant accident with Banki

in accomplishing his desired purpose of atomization. To count on the reading of Banki's drawings merely emphasizes the dearth of the prior art. If Zenith Company can construct a usable carburetor of such dimensions that a part of the conical point of the hollow needle of a needle-valve within the aspirating nozzle will serve as an auxiliary well in starting and in picking-up, we feel sure no one will object. What is objected to is the use of Ahara's disclosed mode of operation and claimed combination of means.

Finally stress is laid on the file wrapper as a bar to giving the claims their natural import and the scope they are entitled to as against the prior art. We have carefully considered the entire contents of this voluminous document. It may be summarized thus: Solicitor and examiner had repeated passes at supposed faults of omission, of redundancy, of phraseology, of terminology, in the description and in the claims. Claims were repeatedly rejected on reference to Crossley, Banki, and other patents. After a considerable time the drawings and description took the form they now have in the patent, and eight claims were submitted. Claims 4 to 8, inclusive, became word for word claims 3 to 7, inclusive, of the patent. Claims 2 and 3, after acceptance of an insignificant change in wording suggested by the examiner, became claims 1 and 2 of the patent. But when the eight claims in final form were presented, they were all rejected, the examiner still clinging to the idea that, because Crossley had disclosed means for providing an increment of fuel and Banki and others had shown that constant-level reservoirs, needle-valves, and other elements were old in the carburetor art, no invention was required to produce the mode of operation and the mechanical combinations of the Ahara carburetor. Thereupon an oral debate between solicitor and examiner took place. What occurred is not recorded in the file wrapper. It may possibly be surmised from a reading of the following written argument filed by the solicitor:

"In view of the oral interview with the examiner, it is believed that the objection as to the passage D being an air passage is removed and the term now used will be satisfactory to him. It is noted that in each of the references the air passage cited to anticipate the claim is the main inlet passage for the cylinder, while the present invention is not an explosive engine, and consequently cannot cover in the claims this passage, but a feeder for the engine, which is an attachment independent therefrom, and discharges its charge of fuel into the air or suction inlet of the engine. With this understanding, it is believed that the claims clearly define over the references cited, which do not show the fuel reservoir having an outlet adapted to feed by gravity into the passage communicating with the atmosphere, whereby the amount of fuel which collects increases during the time that the feed is cut out until the fuel in this passage reaches the level of the reservoir. This operation is not present in the prior art, and the British patent to Crossley does not disclose the same, but merely the broad principle of permitting an overflow from the pump when the feed is cut off. In the reference the fuel which flows into the downwardly extending pipe is not adapted to be drawn into the engine at the next succeeding stroke, and the only fuel capable of this action is the small amount between the inlet connection and the end of the pipe from the pump. It is believed, however, that the present amendment places claims in condition for allowance, and an action of that character is urgently requested."

Thereupon the examiner allowed claims 2 to 8, inclusive, but rejected claim 1 on reference to Crossley and Banki. At this point the solicitor was called upon to decide whether he would accept the allowed

claims, and waive claim 1 as submitted, or amend claim 1 in a further attempt to convince the examiner. He amended claim 1 to read as follows:

"1. A feeder for explosive engines comprising a fuel reservoir having a feed outlet below the fuel-level therein to effect a continuous feed, a passage communicating with the atmosphere and extending below said outlet from said reservoir to receive a gravity feed of fuel therefrom, substantially as specified."

And he accompanied the amendment with the following argument:

"Claim 1 was the only claim rejected by the last official action, and it is believed that the amendment thereto which defines the collecting passage extending below the outlet from the reservoir so as to receive the gravity feed of fuel therefrom is a feature novel in the art, and will be deemed allowable by the examiner. In view of the arguments previously submitted and of the last liberal action of the examiner, it is believed that no further argument is necessary as to the manifest advantages secured by the gravity feed over the structures disclosed in the references of record."

But the examiner rejected claim 1 as finally amended. It then became obligatory upon the solicitor to decide whether he would appeal or close the application by taking out the patent with the previously allowed claims as sufficient protection of the disclosed invention. In a document canceling claim 1 and renumbering the allowed claims, the solicitor said:

"It is believed that the foregoing amendment, which cancels former claim 1, removes all objection to the case and places the same in condition for allowance. It will be conceded that applicant should not be confined in his present first claim specifically to a valve, as his combination is novel when embodying any means for controlling the food supply to the collecting passage, whereby the automatic gravity feed is successfully accomplished and the fluctuations and expense of a pumping action are entirely avoided."

Beyond question the owner of the Ahara patent has no standing to sue upon canceled claim 1 or to seek a construction of an allowed claim that would have the effect of reviving the canceled claim. But that, in our judgment, is the extent of the estoppel. The solicitor's subsequent election not to appeal from the rejection of claim 1 can be given no retroactive effect upon the negotiations leading up to the allowance of the claims in the patent so as to narrow those claims to less than they were entitled to at the time of their allowance. In those negotiations the solicitor always and consistently declared that claim 1 of the patent, for example, produced a new result, through a new mode of operation, by means of a new mechanical combination, and never for a moment conceded that the inventive concept in that claim amounted to nothing but adding to abandoned claim 1 (not then in existence or abandoned) means for controlling the communication between the reservoir and the auxiliary well. On his side the examiner receded from his original position, and allowed the claims in the patent without stating or demanding any limitation or condition not inherent in the claims themselves, or furnishing any contemporaneous glossary for their interpretation. In electing not to appeal from the rejection of claim 1 the solicitor did not agree that the examiner's action was correct; much less that an infringer should take abandoned claim 1, and not the prior art itself, as the measure of invention involved in the patent.

Zenith Company's carburetors employ a principle that was disclosed in Baverey's patent, No. 907,953, December 29, 1908. If the old single-jet carburetor is adjusted to supply the proper mixture of air and gasoline to an engine running 500 revolutions a minute, the mixture is too rich in gasoline when the engine is up to a substantially higher speed, say 1,500 revolutions a minute; if adjusted to 1,500 revolutions, then the mixture is too lean at 500 revolutions. One Krebs was the first to overcome this difficulty. He provided a supplemental air inlet, governed by a spring-held valve, so that with increasing engine-suction there would be a proportional increase of air. Baverey's method was not to supply an additional air inlet, but to supplement the suction fuel-jet with another jet that could feed a unit of fuel in a unit of time irrespective of the engine-suction or nearly so. Manifestly the tendency of the supplemental jet would be to give leaner mixtures at higher speeds; and, if the two jets were properly correlated, the contrary tendencies would balance, and a uniform mixture would be supplied at all speeds.

This Baverey principle was of course unknown to Ahara, who improved the single suction-jet carburetor by providing his U-shaped auxiliary well for use in starting and in picking-up. But it is elementary that if Baverey, coming later, should add to his independent solution of another objection to the old carburetor the Ahara auxiliary well for starting and picking-up, he would infringe the Ahara patent.

From one of Zenith Company's briefs we reproduce a diagrammatic representation of its carburetor:

$B^4$ is the suction jet; $D^2$, the supplemental jet. Air-leg D, of the auxiliary well D $D^1$ $D^2$, is indicated by the dotted lines. This was for the purpose of showing, first, that the Baverey principle could be used without the presence of the air-leg D; and, second, that its presence was merely incidental, and therefore not to be counted in determining infringement. If a hand-valve V be used as the means to control the communication between the reservoir and the jet $D^2$, and if it be turned on at starting, and turned down at low speed and turned off at stopping, the Baverey principle may be employed without having the air-leg D in the carburetor. But the necessity of such frequent manipulation would probably render the carburetor unsalable. And the air-leg is actually employed not merely to do away with the inconveniences that would result from the use of a hand-valve without the air-leg; it is present and is used as an element in the combination of the U-shaped auxiliary well D $D^1$ $D^2$ with the reservoir and means for controlling the communication between the reservoir and the auxiliary well. When there is a period of no suction, it is evident that the gasoline will rise in the air-leg D and stand at the level of the constant-level of the reservoir, and be ready to supply the demand for an excess of fuel in starting.

When there is a period of very high suction, the parts may be and are so proportioned that the air-leg is empty. When there is a period of low suction, depending on the time and the degree, there may be and is a filling up of the air-leg with gasoline ready to respond to the sudden demand for an excess of fuel in picking-up. So the Zenith uses the Ahara combination in the Ahara way to produce the Ahara results.

In the actual Zenith carburetors, instead of the supposititious hand-valve, several nuts with different sized bores through them are furnished to be inserted interchangeably at the point V as the means for regulating the flow from the reservoir to the auxiliary well. Both the Baverey patent and the Zenith catalogues properly recognize the interchangeable nuts as the equivalent of Ahara's needle-valve; and they are certainly "means adapted to control the communication." Inasmuch as Zenith has the equivalent of the Ahara control in the Ahara combination, we regard it as irrelevant that Zenith has a separate control of that part of the fuel stream which feeds the suction jet.

Within the air-leg D Zenith Company has placed a secondary U-shaped auxiliary well to improve the starting operation and separate it somewhat from the operation of picking-up. It is unnecessary to detail this part of the mechanism, for with respect to infringement the only distinction between the primary and the secondary auxiliary well is that the latter receives its fuel supply through an opening in its bottom from the primary well instead of directly from the fuel stream as does the primary well. But when the engine is at rest the gasoline rises in the secondary well to the level of the constant-level of the reservoir; and we find in the Ahara claims no limitation that the communication shall be direct and immediate.

Between Exhibits 1 and 10, which the trial court found to be infringements, and Exhibit 2, which was held not to infringe, the only difference is in the amount of "subatmosphere" in the auxiliary well. This expression has been used by witnesses and counsel to indicate that the atmospheric pressure within all the Zenith auxiliary wells and the Ahara well is less than at the ratio of fifteen pounds to the square inch. But Ahara does not mention subatmosphere. In his drawings the opening to the atmosphere seems to be the full circular area of the air-leg D. In the Zenith wells the openings to the atmosphere are more or less constricted. That, however, was Zenith Company's choice of construction, which cannot be recognized as an escape from Ahara.

The decree should be enlarged to include infringement by Exhibit 2; but as the Ahara patent will doubtlessly expire before a final decree can be entered in the District Court, the relief should be limited to an accounting.

## II. RICHARD.

[4-6] This patent is for an "explosion engine." Some of the improvements are in the carburetor art; and to them the claims in suit are addressed.

Claim 11, the broadest, reads as follows:

"11. In an explosion engine, the combination of a storage-reservoir; a carbureting-chamber connected to the engine-cylinder; a mixing-chamber in the upper portion of said carbureting-chamber; a U-shaped receptacle connected

to said storage-reservoir, one of the arms of which opens into said mixing chamber; and suitable air-ports for the other arm of said receptacle and said mixing-chamber."

Claim 10 is the same as claim 11, with the addition of "a valve above said carbureting-chamber"; and claim 8 is the same as claim 10, with the addition of "means for controlling said air-ports."

These claims must be read, first, according to Richard's own lexicography; and second, against the background of the prior art, to determine the nature and scope of the alleged invention, and what, if anything, Zenith owes to Richard.

Richard's figure 3 is this:

FIG. 3.

In explanation Richard said:

"The atomizer or carburetor proper consists of a main chamber D and a feed-chamber D' therefor. * * * A passage $j$ connects the chambers D D'. * * * The liquid hydrocarbon is delivered through the passage $j$ into an oil-receptacle within the chamber D. This receptacle is shaped somewhat like a letter U, as it consists of a pair of arms or passages $j'$ $j''$, connected at the bottom and open at the top. The arm or passage $j'$ of the oil-receptacle opens into mixing-chamber X. The passage $j''$ opens into or is connected to the air-passage $j'''$. Across the top of the chamber X is a screen $e'$. The screen $e'$ is retained in position by the valve-casing E, which is threaded into the top of the chamber D. The delivery-pipe E' suitably connects the chamber D to the engine-cylinder. Air is drawn through the atomizing or carbureting chamber by the suction of the engine. A valve $e$ is provided for controlling the same. * * * A slanted partition plate or deflector in the bottom of the chamber D is provided to direct a considerable portion of the air passing through the carbureting-chamber into the passage $j'''$.

"In operation air is drawn through the atomizing or vaporizing chamber by the suction of the engine, and a portion of the air passing through the passage $j'''$ into the passages $j''$ and $j'$ becomes saturated with and carries or dashes the liquid hydrocarbon into the mixing-chamber X and against the screen $e'$, where it is met by the in-rushing air, which is thereby suitably mixed therewith and drawn past the valve $e$ into the engine-cylinder. The adjustment of the valve $e$ regulates the amount of air drawn through the atomizer or carburetor."

Laying this disclosure upon the claims in suit, we find that the "storage-reservoir" is D'; the "carbureting-chamber" is the entire space within the casing D from the air inlet at the bottom to the top where it is screwed upon the casing E; the "mixing-chamber in the upper portion of the carbureting-chamber" is the walled off space X, within which the jet $j'$ terminates; the "U-shaped receptacle" is made up of the jet $j'$, the air-leg $j''$, and the passage at the bottom between them, and is located wholly within the carbureting-chamber D; the

"suitable air-ports" are, first, $j'''$ to supply the air-leg $j''$; and, second, the remainder of the intake to supply the mixing chamber X; the "valve above the carbureting-chamber" is the throttle-valve of the engine, and the "means for controlling said air-ports" is the "slanted partition plate or deflector in the bottom of the chamber D."

Richard's idea of the mode of operation seems to be this: If I take the Ahara U-shaped auxiliary well and locate it wholly within the air intake of the engine; if I partition the intake so that the inrushing current of air will be divided into two streams, one to go to the right through the mixing-chamber X and affect the jet $j'$ by aspiration, and the other to rush up the passage $j'''$, down the air-leg $j''$ and into the jet $j'$; and especially if I increase the rush of the air current into the passage $j'''$ by means of a deflecting plate—I obtain not merely aspiration, but I also cause the gasoline to be "carried or dashed into the mixing-chamber X and against the screen $e'$, where it is met by the inrushing air" from the other part of the stream, and thus I produce a better mixture than any known before.

We do not inquire whether Richard was right in his theory. A patentee is entitled to all the benefits of his invention whether he apprehends and states them or not. He must be given full protection in his claims whether he has explained the theory of the operation of his device correctly, erroneously, or not at all. Against an infringer he must be allowed a range of equivalency that is commensurate with his actual contribution to the art. He is not to be limited to particular formation or location of parts, unless the limitations are embodied in the claims themselves or are necessarily imposed by the prior art. We have given Richard's theory only as an aid in framing the definitions of the elements of the claims from Richard's own terminology in connection with the prior art and the alleged infringing structure.

A drawing of the Zenith carburetor is herewith reproduced:

Richard's claims in suit are not limited in terms to the formation and location of parts as detailed in his drawings and description. Taking the terms in their broadest sense, and apart from Richard's dictionary and the prior art, we find in the Zenith carburetors a "storage-reservoir" F; the entire space within the casing from the air intake at the lower-left side of the drawing up to the throttle-valve T may be taken as a "carbureting-chamber"; the space from the bottom of the constricting member X up to the throttle valve T may be called a "mixing-chamber in the upper portion of the carbureting-chamber"; a "U-shaped receptacle" may be found in the air-leg J, the jet H, and the communicat-

ing passage at the bottom between them; a second "U-shaped receptacle" may be found in the air-leg P, the jet U, and the communicating passage at the bottom between them; the air intake at the lower left and the opening A into air-leg J at the upper right are used by Zenith as "suitable air-ports"; the throttle-valve T is present as a "valve above the carbureting-chamber"; and the relative sizes of the air intake of the engine and of the opening A may be considered to be "means for controlling said air-ports."

But on looking to the prior art we find that it was old to recognize the carburetion occurred in the space between the air intake and the throttle-valve. It was established practice, as an aid to efficient aspiration, to constrict the air passage shortly below the tip of the jet and then to taper it up to full diameter below the throttle-valve. Such a construction was called a Venturi tube. But whether a tube of uniform diameter or a Venturi tube was used, the space from below the jet up to the throttle-valve, without being specifically named, was in fact the only "carbureting-chamber" present in the old structure. And the same space, again without being named, was in fact the only "mixing-chamber" present. So without regard to what Richard might say or claim, Zenith Company was free to use an aspirating jet in a Venturi tube. Now the Ahara patent, as we have found, covered his invention of the auxiliary well to whatever extent it could be used with hit-and-miss engines, with throttle-controlled engines, with straight air intakes, with Venturi tubes, and with engines and carburetors not yet devised. Zenith Company, with Ahara's consent, might have applied Ahara's auxiliary well to the old aspirating jet within the old Venturi tube. Whether Zenith Company procured Ahara's consent is of no concern to Richard; that is, Richard cannot be permitted to reach back into the prior art and take any part of Ahara's monopoly of the application of the Ahara auxiliary well to an aspirating jet within a Venturi tube. On the other hand, the Zenith Company in making the application was not at liberty to use any distinct and independent improvements within the Richard patent.

From our examination of the Richard patent, the prior art, and the Zenith carburetors as embodying features that antedated Richard, we find no distinct and independent improvements of Richard's that have been taken by Zenith Company. Richard could not change the nature and function of prior structures by applying to them new word definitions. "Carbureting" and "mixing" may well be taken as synonyms in the general language of the art of aspirating gasoline. In the prior art the single chamber in which aspiration occurs might at will have been denominated either a "carbureting-chamber" or a "mixing-chamber." Applying two names to one structure or to different parts thereof does not make two structures. For a maker of carburetors to infringe Richard he would have to use the walled-off space X, or its equivalent, for a "mixing-chamber" as distinguished from a "carbureting-chamber"—a chamber characterized not only by its physically separate formation and location, but also by its function of "mixing" by means of one branch of the air current within the intake being used to "carry and dash" the gasoline therein, and there to encounter the other branch of the air current. We agree

that "the screen $e'$," which distinguishes claim 6 from claim 11, cannot be read into the claims in suit; but neither can the remaining characterizing structural and functional features of the "mixing-chamber" be read out.

A combination claim must of course be treated as an integer. Its novelty may consist wholly in bringing together old elements. But, as we have already seen, the prior art denies novelty in Richard's combination, if generic definitions be applied to the old elements. Novelty must therefore be predicated upon new characterizing features given to one or more of the old elements. We have found such novelty in Richard's "mixing-chamber" only by putting it in a class different from the old Venturi tube. Similarly the "U-shaped receptacle" cannot be merely Ahara's auxiliary well, which has its air-leg open to the outside atmosphere. Novelty in this feature can be based only on the placing of the entire auxiliary well within the air intake. "Suitable air-ports" must be something different from Ahara's, if the individuality of this element is to characterize Richard's combination as novel. Likewise the "means for controlling said air-ports" must be something distinctive from the relative sizes of the Ahara air intake and of the Ahara opening to the air-leg—it must be the slanted deflector or equivalent means for splitting the air current within the intake into two streams. Of course novelty cannot be found in the storage-reservoir, or the carbureting-chamber, or the throttle-valve of the engine. Infringement would be avoided if Zenith failed to employ any one element of Richard's combination. We find that Zenith has used nothing to which Richard can properly lay claim.

The decree should be modified by striking out the finding that Zenith Exhibits 1 and 10 infringe the Richard patent.

### III. STURTEVANT.

[7] A "double carburetor for explosive engines" is the subject-matter.

Sturtevant stated his problem as follows:

"In the operation of gas-engines which are fed with an explosive mixture of carbureted air some difficulty has been experienced in throttling the engine down to its minimum speed and power without stopping it, this trouble being due to the fact that too fine an adjustment of the throttling devices for controlling the delivery of the explosive mixture to the engine is necessary to be practical, and the control of the engine, therefore, is not at all times absolute or satisfactory."

It is evident that Sturtevant had before his mental vision a throttle-controlled engine provided with the usual single carburetor, namely a device for impregnating with gasoline the air sucked into the engine, consisting of the air intake, the fuel reservoir, and therefrom the fuel tube terminating in the fuel jet within the air intake. He pictured this single carburetor in association with a throttle-valve having the capacity of closing completely the air intake, and thus shutting off the entire supply both of air and of gasoline from the engine. In throttling down an engine so equipped the operator might move the throttle-lever to the closed position, or so near that the minimum of fuel to keep the engine running would not be supplied

and so the engine would stop. To guard against such stoppage the operator might learn, by observation and experiment, the point at which to hold the throttle-lever to provide the required minimum, and then either mark the place on the lever-arc or affix a mechanical stop so that the throttle-valve could not be completely closed. Such was the evil Sturtevant intended to remedy by wholly different means and mode of operation.

Sturtevant explained his means thus:

"Briefly stated, the invention consists in forming the carburetor double—this is to say, having two carbureting-chambers of different fuel capacities, which deliver to the engine-cylinders together under normal running conditions and supply the maximum amount of fuel, but one of which (the main carburetor) may be throttled down or cut out entirely when it is desirable to reduce speed, under which conditions the other or auxiliary carburetor, which is the smaller and which is always open, will supply a minimum amount of fuel sufficient to keep the engine at low speed and prevent its stopping. Furthermore, in starting the engine the smaller carburetor is of the proper capacity to supply the exact charge of fuel to give a proper starting charge at low starting speed and insure the initial starting of the engine, after which the throttled carburetor may be thrown into action and the engine brought up to its full speed."

And this is his mode of operation:

"In operation, assuming that the engine be at rest and the throttle-valve of the main carburetor closed, the engine will be manually turned to give the initial suction or intake stroke to the piston. The suction being through the auxiliary carburetor, fuel in sufficient quantity and of the proper richness will be supplied thereby to start the engine and keep it running at low speed, and the main carburetor can then be thrown into service by opening the throttle-valve and the engine brought to its full speed and power with both carburetors in service and a maximum supply of fuel being delivered to the engine-cylinders. When it is desired to slow down, this may be gradually or quickly done by throttling down the main carburetor until it is entirely cut out, and yet complete stoppage of the engine cannot occur owing to careless throttling down, for the reason that the auxiliary carburetor is still in service and independent of the control of the main carburetor and affords a constant minimum supply of fuel."

Sturtevant's structure is clear. His main carburetor is a complete carburetor in itself. It is associated with a throttle-valve that completely closes its air intake. His auxiliary carburetor is a complete carburetor in itself. To be so, it necessarily has its own separate air intake, its own separate fuel tube, and its own separate fuel jet. It supplies its own separate explosive mixture to the engine independently of any control of the controllable main carburetor. Its air intake is always open, has no association with any throttle. It feeds its explosive mixture, not into the mixing-chamber of the main carburetor at or below the throttle-valve, but through an independent by-pass into the manifold between the throttle-valve and the engine cylinders. Whenever the engine is running, the auxiliary carburetor is in operation and gives the requisite minimum of fuel. Whenever the main carburetor is opened to any degree, the two carburetors co-operate to furnish any desired increment of fuel up to the maximum, which is the sum of the full capacities of the two.

On his disclosure of means and mode of operation Sturtevant started out by claiming "fuel-supplying apparatus for explosive engines, comprising a main carburetor and an auxiliary carburetor."

But the patent office rejected the claim on reference to Schumm's patent, No. 482,201, Sept. 6, 1892, which is for a double carburetor. Thereupon Sturtevant canceled, but eventually was allowed the claim in suit:

"1. Fuel-supplying apparatus for gas-engines, comprising the combination with a main carburetor having a fuel-outlet, and a throttle-valve controlling said fuel-outlet, whereby the amount of fuel supplied from said main carburetor may be varied or completely shut off; of an auxiliary carburetor co-operating with said main carburetor, said auxiliary carburetor having an open fuel-outlet, whereby a desired minimum fuel-supply for the engine is afforded."

It is needless to detail Schumm and other references, for we find in the claim itself all the limitations that Zenith Company deduces from the prior art.

Sturtevant's main carburetor must be associated with a throttle-valve by which "the amount of fuel supplied from said main carburetor may be varied or completely cut off." Looking to the specification of means and the mode of operation to ascertain what Sturtevant had in mind when using the above-quoted limiting clause, we find that he meant a throttle-valve having the capacity of completely closing the intake, thereby completely cutting off the fuel; and that he never contemplated a structure in which the throttle-valve should always be partially open, and in which the fuel-jet should be so large that the minimum of inrushing air would not aspirate the gasoline. Sturtevant's auxiliary carburetor must "co-operate" with his main carburetor. Schumm denies to Sturtevant any monopoly of general co-operation. Therefore what the word in the claim calls for is the specific co-operation that Sturtevant has described. His auxiliary carburetor must be a "carburetor" in the same sense as the main carburetor is a carburetor; that is, a complete carburetor in itself. It must have "an open fuel-outlet whereby a desired minimum fuel-supply for the engine is afforded." That is, it must have means for discharging its own explosive mixture into the engine beyond the control of the throttle-valve and when the engine is running this explosive mixture must always be supplied and be ready to "co-operate" with the mixture from the main carburetor whenever and to whatever degree the closed throttle-valve may be opened. Such, in our judgment, is the scope of the claim.

Turning back to the drawing of the Zenith carburetor, we note that Zenith's alleged auxiliary carburetor consists of the fuel reservoir, the fuel passages leading into the well P, the well P, the fuel jet therefrom terminating at U, and the air intake at the lower left side of the drawing; and that said auxiliary carburetor co-operates with the Zenith main carburetor, which is identified by reference to the fuel-jet S within the Venturi tube.

If the throttle-valve T is closed, there is found in the Zenith structure the equivalent of Sturtevant's main carburetor with its prescribed limitations; but there is no auxiliary carburetor having an opening to discharge its explosive mixture into the engine, for the outlet U is smothered by the throttle-valve.

If the throttle-valve T is permanently held partially open, then, whatever may be said about the presence of Sturtevant's auxiliary

carburetor, no main carburetor is found in its required association with a throttle-valve having the capacity of being completely closed.

Either horn disposes of infringement. But, more vitally, the outlet U is never a discharge for an explosive mixture; it merely feeds raw gasoline. And, still more vitally, when the air current through the main carburetor is pointed to as the means for converting the raw gasoline from the outlet U into an explosive mixture, a demonstration is thereby afforded that Zenith contains no auxiliary "carburetor" at all.

We approve the finding of noninfringement of the Sturtevant patent.

## IV. ANDERSON.

[8] Claim 1 is the only claim in issue:

"1. In a carburetor, a carbureting-chamber, a fuel-jet therein, a constant-level supply-chamber feeding said fuel-jet and exposed to atmospheric pressure, an auxiliary reservoir fed from said constant-level supply-chamber, an auxiliary fuel-jet discharging into said carbureting-chamber and fed from said auxiliary reservoir, an atmosphere inlet for said auxiliary reservoir, and means for maintaining a subatmospheric pressure in said auxiliary reservoir during operation of said carburetor."

*Fig. 1.*

From the fuel reservoir 15, through the passage 17, gasoline is fed through the orifice 21 into the main jet within the Venturi tube, and also is fed through the orifice 27 into the auxiliary reservoir 25, and thence into the supplemental jet 33. The auxiliary reservoir 25 is open to the atmosphere through the restricted opening 31; and it is also open to the chamber 28, in which are openings 29 and 30 into the Venturi tube.

This construction, when the engine is running, produces in the auxiliary reservoir 25 a partial vacuum of varying degrees, which is the "subatmospheric pressure" spoken of in the claim. How it is produced, the mode of operation, the working principle, is thus explained by Anderson:

"It is to be noted that the surface of the fuel in the reservoir 25 is exposed to the pressure in the chamber 28, which, in turn, is subject to the pressure and the variations in pressure in the Venturi tube or carbureting-chamber. It is thus clear that, as the suction in the Venturi tube increases, the pressure in the chamber 28 will be lowered, and the rate at which the fuel passes through the restricted opening 27 into the reservoir 25 will vary accordingly. It has been found by experiment, however, that this variation, while highly desirable and productive of the best sort of a mixture, is too marked for practical purposes, unless properly moderated, and I have secured this moderation by means of the restricted passageway 31 to the atmosphere. The passageway is restricted to such an extent that it cannot satisfy the suction created in the chamber 28, and it therefore follows that the pressure on the surface of the fuel in the reservoir 25 is lessened, as the engine speed increases,

so that, as before pointed out, the flow through the passageway 27 is varied accordingly."

Anderson's mode of operation is unmistakable. He creates a partial vacuum in the chamber 28 by means of engine-suction through the openings 29 and 30 into the Venturi tube; the partial vacuum varies in tensity with the varying tensity of the engine-suction; he finds that high suction produces too much "subatmosphere"; and so he "moderates" his "subatmosphere," partially destroys the vacuum tensity, by admitting outside air into chamber 28 through the restricted opening 31.

Whatever of inventive creation was involved in producing the Anderson combination of means to obtain the Anderson result in the Anderson way is entitled to protection not only by specific claims but also by the most generic that could be drawn to fit Anderson's inventive concept. But infringement of the broadest as well as of the narrowest claims can be predicated only on a structure that embodies substantially the Anderson combination of means to obtain substantially the Anderson result in substantially the Anderson way.

As a basis for charging infringement of claim 1 by the starting feed of the Zenith carburetor, Exhibit 2, Stromberg Company identifies the generic terminology of claim 1 with the specific disclosure of means in the following manner:

1. "A carbureting-chamber" is the space from the air-inlet 7 to the explosive-mixture discharge 8.

2. "A fuel-jet therein" is the jet 19.

3. "A constant-level supply-chamber feeding said fuel-jet and exposed to atmospheric pressure" is the constant-level chamber 15.

4. "An auxiliary reservoir fed from said constant-level supply-chamber" is reservoir 25.

5. "An auxiliary fuel-jet discharging into said carbureting-chamber and fed from said auxiliary reservoir" is the jet 33.

6. "An atmosphere inlet for said auxiliary reservoir" is the opening 31.

7. "And means for maintaining a subatmospheric pressure in said auxiliary reservoir during the operation of said carburetor" is the bored nut 32. Several nuts of different sized bores are furnished so that the diameter of the opening 31 may be varied in relation to the openings 29 and 30 into the Venturi tube and the discharge outlet of jet 33. This interchangeability of the bored nut 32 is for the purpose of assisting in the proper initial adjustment of the carburetor to different engines.

Turning back to the drawing of the Zenith carburetor, we find that Zenith has the equivalent, specifically and generically, of Anderson's first element, in the carbureting space from the air intake at the lower left side of the drawing up to the explosive-mixture discharge at the top of the drawing; of his second element, in the double-jet S; of his third element, in the fuel reservoir F; of his fourth element, in the auxiliary reservoir or well P; of his fifth element, in the fuel-jet U; of his sixth element, in the atmosphere inlet A; and of what Stromberg Company has chosen to identify as his seventh element, in the ability and practice of Zenith Company to regulate the size of

the atmosphere inlet for the purpose of aiding in the proper initial adjustment of the carburetor to a given engine.

But Zenith carburetors 1 and 10 and Baverey's patent No. 907,953, December 29, 1908, which was cited against Anderson in the patent office, were in the prior art. Zenith carburetors 1 and 10 contained item for item the elements we have pointed to in the Zenith drawing. So naturally no attempt was made to subordinate them to the Anderson patent. Before Anderson's time Zenith had modified the carburetor as shown in the drawing by closing the top of the well P and admitting air thereto through restricted openings into the well J. And no charge of infringing the Anderson patent could be laid upon that modification. Since Anderson's time the only change in Zenith is found in Exhibit 2. In this, instead of air being admitted to the closed well P through restricted openings into the well J, it is admitted through restricted tubes from the outer air. And on this slight change in construction, and the additional result that is supposed to be obtained thereby, the question of infringement turns.

By means of Ahara's air inlet D and Zenith's restricted air inlet A subatmosphere was created in their respective auxiliary wells. There has always been subatmosphere in the Zenith wells, both P and J. In the structure of the Zenith drawing there may not be much, if any, difference in subatmospheric pressure in the two wells. When Zenith closed the top of the well P and admitted air thereto through restricted openings into the well J, there was undoubtedly a nearer approach to vacuum in the well P than in the well J. And in the Zenith carburetor, Exhibit 2, there is a greater degree of subatmosphere in the inner well than in the outer. But we are unable to determine from the record whether there was any greater or any less degree of subatmosphere in the inner well when air was taken from the outer well than when taken from outside the carburetor. As means of admitting air into the inner well, the restricted openings to the outer well are the equivalents of the restricted openings to the outer air, unless there is a difference in results, for mechanically it is immaterial whether the air is admitted mediately or immediately from the outer air. No infringement can be laid upon Zenith's Exhibit 2, if all that Zenith got was substantially the old result in substantially the old way. But because the proofs do not enable us to find definitely that Zenith obtained merely the old result, we proceed to determine whether Stromberg Company is correct in saying that the seventh element is any means, of the general nature of the nut 32, adapted to regulate the admission of air into the inner well from the outer air.

In support of its right to point to the restricted passages in Zenith's Exhibit 2 from the inner well to the outer air as the equivalent of the seventh element, Stromberg Company asserts that the presence of subatmosphere in the prior Zenith carburetors was incidental, insignificant, detrimental, and contrary to the desired operation; and upon this assertion predicates a claim that Anderson was entitled to monopolize any desirable and intentional use of subatmosphere in carburetors, even though the mechanical elements were found similarly combined in prior structures. It is true that subatmosphere in the Zenith outer

well J, which supplies the supplemental jet H, runs counters to the Baverey principle of supplying the supplemental jet with a unit of fuel in a unit of time and makes it impossible of complete realization. Indeed, the use of any auxiliary well, as we have heretofore seen, is unnecessary to the employment of that feature of the Zenith carburetors. But in every Zenith starting well (the inner well P) subatmosphere has been desirable and in accord with the intended purpose in starting, because in response to subatmosphere the action of the starting jet is augmented and prolonged, and thereby the interval of time that passes before the suction in the Venturi tube is sufficient to lift the gasoline from the main jet is bridged. And if the intent of a maker may be judged by the beneficial results produced by his mechanism, the use of subatmosphere in the prior Zenith starting well was intentional. So there is no basis in fact for the contention that Anderson's patent is to be scanned from the viewpoint that he was the first to devise means for the beneficial and intentional employment of subatmosphere in carburetors.

In our judgment Anderson himself furnishes three demonstrations that Stromberg Company is in error in asserting that Anderson's seventh element in claim 1 refers generically to any means for regulating the admission of outer air to the inner well which have a mode of operation and produce results analogous to the mode of operation and results of Anderson's interchangeable nut 32, which determines the size of the opening 31.

1. In his specification, herein above quoted, Anderson shows that his characteristic subatmosphere is created by the action of the openings 29 and 30 into the Venturi tube in connection with the suction through the Venturi tube; that at high speeds too much subatmosphere is thereby created; and that he destroys the excess by admitting outer air through the opening 31. In other words, if Anderson had not found by experiment, as he says he did, that his means for creating subatmosphere operated excessively at high speeds, he never would have put into his carburetor the opening 31, which is present merely as a moderator of the active means, just as a governor moderates, but does not create, the applied power of an engine. Zenith Company has no carburetor in which the passageway from the outer air to the inner well has any such mode of operation or produces any such result. But Stromberg Company insists that we cannot accept Anderson's definition of his seventh element, because to do so would make that element the same in claim 1 as in claim 2, wherein that element is additionally defined as "comprising a duct for the passage of air only, communicating with said carbureting-chamber and with the auxiliary reservoir above the level of the liquid therein." Taking definitions of terms from Anderson, we believe structures can be imagined which would infringe claim 1 without embodying the quoted limitation in claim 2, and so both claims would be purposeful. But we do not stop to picture supposititious structures, because if we are mistaken in our belief, and if claim 1 must fall unless we accept Stromberg Company's definition and reject Anderson's, then fall it must.

2. On his specification of means and mode of operation, Anderson

submitted claims, several of which were rejected on reference to Baverey. Their general character may be gathered from the following:

"In a carburetor the combination of a suction-controlled fuel feed-jet, a constant-level supply-chamber therefor, an additional jet, and means for supply to said additional jet arranged to deliver varying quantities of fuel according to the pressure produced by the engine."

The objection to this claim is that, if the arrangement for varying the discharge from the additional jet to correlate with the pressure produced by the engine, which is the arrangement for creating subatmosphere, is not confined to Anderson's stated means and method of creating subatmosphere, but is aimed to cover the inlet from the outer air into Zenith's prior auxiliary well, then the claim is void in the light of Baverey's disclosure.

Anderson acquiesced in the rejection. In submitting the present claims, he distinguished from Baverey, as he in fact had already clearly done in his specification of means and mode of operation, by pointing out that his "operation is brought about by maintaining a subatmospheric pressure in the auxiliary reservoir even though the said reservoir is connected with the atmosphere." That is, Anderson's characteristic subatmosphere is obtained, not by means of, but in spite of, the Baverey-Zenith inlet. And thereby Anderson became estopped from contending that the Zenith characteristic subatmosphere was immaterial in the prior art, and that he was entitled to a general dominancy of subatmosphere in carburetors—a contention we have heretofore examined and found to be wanting in merit.

[9] 3. Anderson's claim 4 is word for word the same as claim 1, except that the sixth element, "an atmosphere inlet for said auxiliary reservoir" in claim 1, becomes "a restricted atmosphere inlet for said auxiliary reservoir" in claim 4.

Of course the other elements, including the seventh, must be given exactly the same value and scope in both claims.

Respecting the differentiation of the sixth element, claim 1 calls for an inlet regardless of restriction—for example, Anderson's inlet with the interchangeable nut 32 omitted; while claim 4 demands a restriction of the inlet—for example, such a "restricted inlet" as is provided by the bored and interchangeable nut 32.

Now, if this suit were based on claim 4, it would be apparent at once that the nut 32, or its equivalent in general character, could not be taken as the seventh element after having been properly identified as the sixth element. And though only the opening and not the nut itself as a restricting means is in the sixth element of claim 1, nevertheless the seventh element, being in the same words and based on the same statements of means and mode of operation, must be taken to refer to the same thing in both claims. And inasmuch as the nut 32, or its equivalent in general character, cannot be the seventh element of claim 4, it cannot be the seventh element of claim 1.

Granting validity to Anderson's claim 1, we find that it is not infringed.

The cause is remanded, with the direction to amend the decree conformably to this opinion. Costs in this court are to be equally divided.