### STROMBERG MOTOR DEVICES CO. v. DETROIT TRUST CO.

No. 4223.

Circuit Court of Appeals, Seventh Circuit.

Sept. 17, 1930.

Charles A. Brown and George I. Haight, both of Chicago, Ill. (W. Kerkam and L. H. Sutton, both of Washington, D. C., of counsel), for appellant.

Earl L. Parmelee, of Pittsburgh, Pa., and Walter E. Oxtoby, of Detroit, Mich., for appellee.

Before ALSCHULER, EVANS, and PAGE, Circuit Judges.

ALSCHULER, Circuit Judge.

There is here involved the accounting under a decree in this cause entered in pursuance of the direction of this court in an appeal involving the question of validity and infringement of the patents which were sued upon. 254 F. 68.

Certain questions involved in the accounting have been before us on appeal. 270 F. 421.

In the interest of brevity we refer to those cases for statement of the facts, so far as here pertinent and in those opinions appearing.

After a protracted hearing on the accounting, wherein appellant sought recovery of the profits from the infringement of the Ahara patent, the master submitted a preliminary report, in which he recommended the entry of a decree for appellant in the sum of $400,822.-07. Upon consideration of objections to the report the master amended it somewhat, recommending in his report as filed in the court a decree for $353,196.49 in favor of appellant.

Upon exceptions to the report the court

960

concluded and found that certain items in it could not stand, confirming it as to others. Among the exceptions sustained were those as to the apportionment of profits which the master undertook to make as between the infringed Ahara patent and the Baverey patent, to which two patents the master had attributed the entire profits. The court held that while the record justified the conclusion that segregation of the profits as between the Ahara patent and the other elements of the infringing carburetor was not impossible, "the master's award cannot stand, because of failure to determine the issue of segregation upon the evidence before him." And the court concluded, "I have reached the conclusion that the case should be remitted to the master in view of the necessity of vacating the award because of failure to determine the issue of segregation."

In his report upon such re-reference the master said: "The master assumed that on the re-reference further evidence on the question of segregation should be introduced. No such evidence was introduced and the record stands in that respect exactly as when the case was heard before the court."

The report then states that since elements other than the Ahara patent entered into the unitary carburetor structure, and the profits attributable to the various elements were segregable, the burden of making the segregation was on appellant, under the authority of Dowagiac v. Minnesota, 235 U. S. 641, 35 S. Ct. 221, 59 L. Ed. 398, and Westinghouse v. Wagner, 225 U. S. 604, 32 S. Ct. 691, 56 L. Ed. 1222, 41 L. R. A. (N. S.) 653; that appellant did not sustain this burden, nor undertake to do so; that there was no proof of reasonable royalty; and a recommendation was made that appellant recover nominal damages only.

The court overruled exceptions to this report, approved it, and entered a decree for appellant for $1, adjudging costs against appellant. From this decree the appeal is prosecuted.

Apart from the question arising on apportionment of profits, it is insisted for appellant that large items of profits were erroneously excluded by the master and the court, and that other large items, allowed as deductions from the profits, were erroneously allowed by the master and the court.

If the decree is correct on the subject of apportionment of profits, no other question need be considered. This will therefore have our first attention.

Apportionment.

Reference to our opinion in 254 F. 68 would indicate the quite complicated and involved relation of the Baverey patent to the infringing Zenith structure. The conclusion there reached was that both the Ahara and Baverey devices inhered in the Zenith carburetor. Upon the accounting and in the briefs and arguments much was presented and strenuously urged to impugn that conclusion; but upon careful re-examination of all that has been so adduced and urged, we see no reason to depart from our prior conclusion, so far as it may affect the accounting.

There is no controversy about the general rules which govern such situations. Where recovery is sought of the profits of a patent infringement, if it appears that other elements beside the patented feature entered into the article, and contributed to the profits, these will be apportioned in accordance with the contribution of each, unless it is made to appear that apportionment is impossible, in which case, under the doctrine of confusion of property, the infringer must account for the entire profit. But if it appears that apportionment can be made among the various contributing elements, then the burden of making the apportionment is upon him who seeks recovery of profits to show what part of the profits is attributable to his patent; and, failing to make such segregation, he may recover not more than nominal damages.

The statement of these principles is simple enough, but their application frequently involves much of difficulty and embarrassment. At just what point the evidence may indicate possibility of segregation, without at the same time giving indication of some approximately fair basis of apportionment, may not in many instances be easily conceivable. It is common experience that supporters of the plaintiff's side of such a controversy consciously or unconsciously strive to exalt and swell the profits attributable to the infringed patent, and to depress the influence thereon of the other constituent elements; while those interested in minimizing the recoverable profits will correspondingly minimize the comparative influence of the infringed patent in the structure. In this respect the record here is quite typical. Through oral evidence, charts, experiments, etc., each side would shrink, quite to the vanishing point, the importance in the structure, and therefore in its contribution to the profits, of the element or elements whereon the opposite party relies,

and correspondingly exalt the contribution of its own side.

Without entering upon a critical analysis of the voluminous record thereon, we are prepared to accept the master's original conclusion to the effect that the profits on the infringing Zenith carbureters are, in practical sense, the result of the contributions of both Ahara and Baverey. By this it is not meant that some other elements did not enter into its structure, but that the distinguishing profit-making features, which gave it instant and wide recognition, were substantially all in the Ahara and Baverey contributions.

If witnesses in such case testify to percentages or dollars of contribution, and do not disagree, there might be no difficulty on that score. If they disagree, the difficulty of determination increases as the divergence between them widens. If, on one side, the experts had testified that Ahara contributed to profits say but 5 per cent. and other elements 95, this might be well and good until on the other side it was testified that Ahara contributed 95 per cent. and the other elements but 5.

In such situation the trier of the fact, be it master, jury, or judge, must decide as best may be under the conflicting evidence, and this was what the District Court said the master should here have done, but failed to do (or did erroneously). While reams upon reams of evidence were given as to the comparative contributions of Ahara and Baverey to the profits of the infringing carburetor, we do not find that any witness indulged in definite estimates of dollars or percentages of contribution. But without giving figures they expressed their several views of the contribution of Ahara and Baverey by employing adjectives, such as "little," "much," "slightly," "very," etc., all of which were more or less useful in assisting the inquirer to arrive at some fair conclusion of the contribution of these elements, and were perhaps not less helpful than would have been extreme figures submitted by the opposite sides of the controversy.

Involved in the proposition of segregation is a question of a deduction from profits of payments to the amount of $523,221.91, which, during the infringing period, was made by the Zenith Company to the parent company in France, as royalties for use of the Baverey patent, which the French company controlled. The propriety of the allowance will be hereinafter considered, but the subject is here referred to for its bearing on the issue of segregation of profits.

In his preliminary report the master, treating of the segregation of profits, said: "The right of an accounting defendant to have profits segregated in cases where all of the profits are not due to the patent infringed is not questioned as a general rule, but in this case, where all of the profits are due to the Ahara and Baverey patents and royalties that equal or exceed the value that Baverey gave to the infringing structure have been allowed, defendant is not entitled to a segregation of profits."

By this the master evidently meant that since the royalties paid for the Baverey patent contributed at least that amount to the profits, the defendant was not entitled to have any further segregation of the profits. The master made this clear in passing on the objections to the report when he said:

"The statement in the findings of law on page 37 'Defendant is not entitled to a segregation of profits' should not have been made as it appears from what was said in the findings of fact and law in the draft report that segregation had in fact been made. The conclusion was first reached that all of the profits were due to the Ahara and Baverey patents, that these patents dominated the structure and produced the sales. The controversy on the question of segregation was therefore between Ahara and Baverey. What was not due to Baverey was due to Ahara and what was not due to Ahara was due to Baverey. The evidence is conflicting and any conclusion reached as to the relative merits of the two patents involved must rest largely in opinion and depend upon the weight to be given to the respective witnesses who testified on both sides of the case and such a conclusion might or might not approximately express the truth of the situation. After considering all of the evidence in the case the conclusion was reached that the profits due to Baverey did not exceed the royalties paid, but that such royalties were a fair and reasonable value for the use of Baverey. The evidence establishes that the royalty arrangement was made in good faith, and whether too much or too little was paid for the use of Baverey is immaterial as in either case the defendant would be entitled to credit for the amount actually paid.

"It follows that segregation has been made by fixing the value of Baverey at the amount of royalties paid and giving to Ahara the remainder of the profits.

"It is not the master's intention to recommend for adoption in all cases a rule that the value of a patent may be measured by the

royalty paid to the owner. Such a rule has been condemned by the courts in cases then before them, but the courts have not held that to measure profits by royalties paid could not in any case be proper, and in the master's opinion in the facts and circumstances of this case the method adopted is the best method to be used and gives fair and reasonable results."

In the preliminary report the net profits, including the royalties, but not excluding federal income and profits taxes, were fixed at $1,203,279.18. But in the report as filed there was deducted an item of profits on miscellaneous parts of $76,287.90, and $397.29 of small items, leaving a net profit of $1,126,-593.99, out of which the master recommended, as representing the contribution of the Baverey patent, the amount of the royalties which had been paid, $523,221.91, and recommended that the remainder of the profits be considered the contribution of the infringed Ahara patent. This is the plain import of the last above quotation from the master's filed report.

The report of the master upon the re-reference does not necessarily indicate a change in his conclusions reached before, that a fair apportionment of an assumed profit of $1,-126,593.99 would be $523,221.91 to the Baverey patent and the remainder to the Ahara patent. But construing the court's statement that "the master's award cannot stand because of failure to determine the issue of segregation upon the evidence before him" to be a requirement that further evidence thereon must be submitted, the master recommended nominal damages for failure to submit further evidence thereon.

Where a patent infringing unitary structure possesses elements other than the patent, contributing to profits on sales of the structure, in most cases it would scarcely be expected that different persons considering the same facts would reach the same concrete result in making apportionment of profits among the various contributing elements. In most instances this would be because exact figures or proportions are not possible of ascertainment, any more than in many other relations, particularly in tort actions (which in their essence patent infringement actions are). This does not mean that segregation and apportionment are impossible. The master and the court both definitely found it here possible, and in this we agree.

From our careful examination of the record and the contentions of the parties, and the briefs and arguments, and independently of the master's conclusions, we would estimate that the infringing patent and the Baverey patent contributed not far from equally toward the profits. But recognizing as we do the master's long and varied experience in such matters, and the advantage he had in seeing and hearing the witnesses, who were quite numerous, we are better satisfied to adopt the ratio which his figures, as reported, would indicate. Assuming therefore, as the master found, that to a total net profit of $1,126,593.99 the Baverey patent contributed $523,221.91 and Ahara the remainder, this would indicate the proportion of the Ahara contribution to be 55.558 per cent. This percentage we therefore adopt as the share of the ultimate divisible profits to which appellant is entitled.

Having determined upon a basis of apportionment of the profits, we will consider such of appellant's propositions as bear substantially upon the amount of the net profits.

### Royalties.

What we have said above, respecting the royalties, had reference to their employment by the master in fixing the proportions of contribution to profits by the several contributing elements. Appellant contends that the payment of the royalties was but an indirect manner of distributing profits, and that the royalties should be added to, rather than deducted from, the net profits, and accounted for accordingly. The agreement for the royalties was made long before this litigation commenced, and from the record seems to us to have been in entire good faith. When made it was for 20 per cent. of the gross business of the Zenith Company. Somewhat later this was reduced to 20 per cent. of the net business; and afterwards to 14 per cent., and still later to 10 per cent. This of itself would tend to repel, rather than to establish, the conclusion of fraudulent distribution of profits with the purpose of thereby reducing the apparent profits as against a possible future accounting.

Appellant makes much of the fact that the stock of the Zenith Company, a Michigan corporation, was largely held by the French company and its stockholders, to which company these royalties were paid. This does not necessarily indicate a fraudulent payment of the profit, nor a payment as profits rather than as royalties. The companies were separate entities, and if the royalties were in good faith paid as such they should be upheld, whether large or small, and to the same extent as if paid in good faith as royalties, to persons wholly disconnected with the

Zenith Company, by stock interest or otherwise.

In 270 F. 421, we had occasion to deal with further payment of the royalties to the French company, and concluded from what was then before us that the royalty payments made and to be made were not in bad faith, and merely for the purpose of distributing profits, and we declined to enjoin their future payment. Nothing has subsequently appeared, either in evidence or argument, to indicate that we then reached an improper conclusion, and we agree with the master and the District Court in supporting the payment of the royalties to the French company, and refusing to add them to the profits to be accounted for.

In considering the royalties the master, as above appears, expressed the propriety of deducting them from the profits as an expense, and in this we fully agree. But in his recommendations he treated the royalties as though they were profit, and, as has been seen, allowed them to the accounting party as representing that proportion of the entire net profits which the accounting party had, through Baverey, contributed, awarding appellant the remainder of the profits.

This treatment by the master the District Court held to be erroneous, pointing out that they could not at the same time represent an expense of the business, and also the accounting defendant's contribution to the net profits. In this we are in accord with the District Court. If, as we think they must be regarded, these royalties were an expense of the business, then as such they should and must be deducted from profits before apportionment is actually made.

### Heftler's Commission.

Under contract with the Zenith Company, Heftler managed its business, receiving under written contract a small fixed salary, and a certain percentage of the business done. This percentage amounted, for the infringing period, to $98,700.49. Of this amount the master deducted from the profits, as an expense of the business, $73,968.43. The balance had been for some time in dispute between the company and Heftler, upon the contention that the federal tax should be first taken out before Heftler's proportion was figured. The company finally gave up the contention, and paid Heftler the retained balance of $24,732.06, but the master disallowed this balance as an expense. The court not only approved what the master allowed as an expense, but found that the $24,732.06 should also have been so allowed. Appellant contends that this percentage payment to Heftler was not compensation for his services, but was distribution of profits, and as such should be added to net profits.

We see nothing in the record to question the good faith of the contract as one for remuneration for services. The business was evidently well conducted, was large, and very profitable, and for the more than eight years of this accounting period the whole amount paid represents a compensation to Heftler which is not at all out of reason as such matters go.

In dealing with the question Judge Geiger said: "Indeed, if once the contract is upheld as a service contract, the avails thereof were as deductible before the Government tax as were ordinary straight wages. * * * And the defendant, merely by paying the Government without deducting Heftler's compensation, could not deny the right to demand it. An overpayment on taxes could not justify underpayment to him. Therefore, unless it appears that Heftler's right in some way became extinct, that his acceptance of the smaller amount was in composition, compromise or in surrender of his larger right, the recognition of the right by the directors, howsoever long deferred, in no sense changed the true character of the later payment as a liquidation of a subsisting debt; nor can it be characterized as a 'gift,' or an 'increase,' retroactive, of his compensation. I am satisfied that upon the record allowance of this amount to the defendant should have been recognized just as fully as the master recognized the balance of the compensation paid to Heftler."

Approving, as we do, the conclusion of the court on this proposition, the master's deduction from profits upon this item of $73,-968.43 should be increased by the sum of $24,734.06.

### Interest on Investment.

In his preliminary report the master found $47,441.52 as an item of reduction of the profits, as interest on invested capital of the Zenith Company. This item is subject to reduction of $3,007.79 under the amended finding of the master in his report as filed, because of his disallowance of profits on the item of "Miscellaneous Sales." The reduction of profits by allowance of interest on invested capital is a practice too well established to require argument or citation to sustain it.

Appellant contends that much of the capital came from profits on the business, and as this resulted from the unlawful use of

Ahara's patent, interest on such capital so employed was in no event allowable.

Appellant is seeking profits, and if it receives these it has the compensation it sought. Upon the invested capital which the Zenith Company employed in its business to earn these profits, it is entitled to a deduction of interest from the profits, regardless of the source of that capital. To allow appellant the profits attributable to its patent, and to deny appellee a deduction from profits of interest on investment because, forsooth, some of that capital came from accumulated profits, would, to that extent, give appellant a double profit, and to this it is not entitled. When recovery of profits is sought, the one seeking them takes whatever chance there is of reduction in the profits by the usual and proper expenses and allowances.

■ In this connection we also treat appellant's contention that the recoverable profits should be increased by interest upon dividends which have from time to time been paid to the stockholders of the Zenith Company. We see no basis for such claim, in this connection again saying that when appellant shall have received all recoverable profits resulting from the infringement of its patent, it will have received all that it asked for, regardless of the manner in which the accounting party disposed of or distributed these profits. The only materiality of such dividends might be the evidence they may afford of profits which the business yielded, in case this did not otherwise sufficiently appear.

### Good Will.

■■ Appellant further contends that the profits as found should be augmented by the item of good will, which it contends to be very large—in excess of $500,000. The value of a good will is not easily ascertainable, but when demonstrably present may be considered in arriving at profits. The presence, extent, and value of a good will is, in its very nature, largely conjectural, and since it has to do mainly, if not entirely, with the influence of the past upon the future, the experience of the infringer subsequent to the infringing period, if such is available, might be of greater aid in determining whether there is a valuable good will, than would prognostications of results and future profits made about the time the infringing period closed. The long time which elapsed between this infringing period and the making of the master's report enabled the master to judge from actual experience whether or not a profit definitely accrued in the way of good will. On this subject the master said in his report:

"It is easier to determine the value of good will of a going concern at a given time by taking the experience of the concern for a few years after such time than by speculating as to what the future shall be, and in this case opportunity affords itself for the application of such a test. The defendant made large profits during the year immediately following the accounting period. The reason for these profits is not entirely accounted for, but it is a matter of common knowledge that this year was the most prosperous year in the automobile business in all of its branches since the beginning of that industry and for the first part of the year at least the company was still running on Government contracts. During the second and third years the company operated at a loss and the losses of these two years more than offset the profits made during the first year, and if the three years shall be considered together as a period a loss was sustained.

"The requirements necessary to make it possible to determine the value of good will, unless we shall resort to speculation and conjecture, are not present in this case. The period of the existence of the defendant company was abnormal. It was scarcely on its feet in a business way before the World War broke out. The war created a great demand for carburetors that might be used for war purposes, and after this country entered the war large and paying contracts were made. The war ended at about the close of the infringing period. The short period of this company's existence and the abnormal conditions prevailing during the time make it impossible to say whether there was a good will of value at the close of the period and nothing has been awarded to the plaintiff on that account."

The court overruled the exceptions to the master's report respecting good will, and without further discussion of the proposition we indicate our approval of the master's treatment of it and his own and the court's conclusion thereon.

### Miscellaneous Sales.

■ It is insisted that the master improperly disallowed, as profits to be accounted for, the profits on the so-called miscellaneous sales, which consist in the main of parts, such as tubing, manifolds, and other connections bought outside and used for connecting up carburetors with the engines. They were no part of the carburetor, and not covered by the patent in suit. They were not manufactured by appellee, but bought outside and resold.

The master calculated the profits upon the miscellaneous parts at $76,287.90, but found that appellant failed to show that the profits on the sale of these parts were due to the infringement; and this finding the court sustained, and upon the record we do not feel at liberty to disturb it.

However, in the calculations we have adopted it will be necessary to allot to the item of profits on miscellaneous parts its ratable proportion of the federal income taxes, as well as of interest on investment, as will hereinafter appear. Royalties need not in this connection be considered, since they bear no relation to the miscellaneous sales, as these did not involve royalty payments.

### Federal Income and Profits Taxes.

In his report as filed the master found that the total of such taxes for the infringing period was $232,190.97. Of this amount it appears from the report that as late as September 20, 1921, these taxes for the year ending September 30, 1918, amounting to $160,317.18, had not, for reasons not fully appearing, been paid. In his report the master recommended that the amount of such taxes as had been paid be deducted from profits; and recommended further that if at the time of the entry of the decree the last-named sum had not yet been paid, it be added to the amount which appellant shall recover from appellee.

In passing on this branch of the master's report the court said:

"The master recognized the right of an accounting defendant to an allowance for taxes paid. In a particular case the question may be presented with a double aspect, viz.: (a) Was the accounting defendant under liability to pay a tax in respect of property or of income which is the subject matter of the account; and, (b) if so, was it possible to state the amount of such liability?

"In other words, the account, in dealing with taxes as an allowance, recognizes the Government as a party in the same sense in which third parties to transactions out of which other allowances arise, are recognized. The plaintiff, in an accounting, is in no other or different position in respect of the liability. He is not in the position of contesting a tax against his income. In the present case the master answered both of the above queries in the affirmative and definitely fixed the amount of tax liability. I do not think that his conclusions are seriously challenged; but neither the master nor the plaintiff can have any concern, the liability having been fixed and determined, with its actual payment; and the act of the master in conditioning the allowance upon payment before decree, seems to me to be no part of an accounting."

It does not appear to be definitely settled in just what instances the profits of infringement may be reduced by federal taxes, and in what they may not. In the case of Larson, Jr., Co. v. Wrigley, Jr., Co., 20 F.(2d) 830, we undertook to deal with the question, and to have the deduction allowed subject to the ascertainment of how much had been paid of such taxes which would have been payable by the aggrieved party had it received the profits as they were earned. The Supreme Court, however, disapproved of this disposition of the question, and denied to the accounting party any deduction for federal taxes paid. Larson, Jr., Co. v. Wm. Wrigley, Jr., Co., 277 U. S. 97, 48 S. Ct. 449, 72 L. Ed. 800. But we infer from the opinion that the denial was predicated largely, if not entirely, upon the conclusion that the accounting party was doing "what he knew that he had no right to do." The court said: "No doubt there are cases in which such a deduction would be proper. * * * Circumstances will affect the conclusion, including in them the knowledge and the conduct of the party charged."

If from this language it may be concluded that where the accounting party had been acting in good faith, and with his infringement there was no admixture of deliberation or willfulness, "such a deduction would be proper." If not in such a case, we fail to comprehend the significance of what was so said.

There is nothing in this record to impugn appellee's good faith in these transactions. The question of appellee's infringement was involved in much serious doubt—at least it so appeared to this court, in which, after the first oral argument on the merits on the alleged infringement, the cause was, at the request of the court, twice orally reargued. Surely this court is in no position to hold that, on the face of this record, appellee appears to have been a willful infringer. We find nothing in the record that would give color to such a contention.

Concluding, therefore, that this is a case wherein the infringer may deduct from profits the amount of its federal taxes during the infringing period, we approve the treatment of the subject by the court, and conclude that from the net profits found there should be deducted the entire amount of appellant's federal income taxes during the infringing period. But if it should be the fact that ap-

pellee has adjusted, or will adjust, the reported unpaid tax at less than the amount it then appears to be, a corresponding adjustment in the deduction of taxes from profits should be made, and appellant's recovery increased in the Ahara proportion of the profits.

### Interest.

The subject of interest upon a recovery by appellant does not appear to have been considered in any of the master's reports, nor by the court, nor in the briefs of counsel. But we are of opinion that justice between these parties requires that interest be allowed. In our opinion in Larson v. Wrigley, 20 F.(2d) 830, 836, the question was considered, and Tilghman v. Proctor, 125 U. S. 136, 8 S. Ct. 894, 31 L. Ed. 664, was cited in support of the proposition that upon accounting of profits of a patent infringement, in the absence of special circumstances, interest on the award will be allowed from date of the filing of the master's report. There are here no special circumstances which should vary this rule, unless found in the long pendency of the litigation. But for this we cannot hold appellant to any larger degree of accountability than appellee and the several courts in which the litigation has been pending. To the amount found due there should be added interest at the rate of 5 per cent. per annum from August 22, 1924, the date when the master's report was first filed in the court.

### Costs.

In its final decree the District Court assessed the costs of the accounting against appellant. The costs are no doubt heavy, and in the disposition we make of the case we cannot permit to stand the court's order as to costs. The demands asserted by appellant upon the accounting far exceeded any possibility of recovery, and these extravagant claims had their full share in prolonging this protracted and expensive accounting.

It is our view that one-half of the costs of the accounting herein and of this appeal should be paid by the appellant and the other one-half by the appellee.

### Conclusion.

The several foregoing deductions may not in all particulars be strictly and mathematically accurate, nor in precise accord with the most advanced canons and practices of accountancy; but they do indicate our best judgment upon a much involved situation; and, in the faith that they fairly and sufficiently aproximate equity between these parties, we will refrain from causing the further delay which remandment of this sixteen year old lawsuit to the District Court for further accounting would of necessity incur, and we make concrete directions for the entry of a decree in accordance with our above stated views.

To this end the following summary of items and computations is made:

The figure which the master's first filed report fixed, and which we adopt as the basis for fixing the percentage of profits attributable to appellant's patent is . . . . . . . . . . . $1,126,991.28

From this amount there is deducted:

 (a) Royalty paid to French Company . . . . . . . . . . . . . . 523,221.91

 (b) Federal taxes . . . . . . . . . . . . . . . . . . . . . . . . $232,190.97
 Less proportion thereof attributable to profits on miscellaneous parts (on basis of the apportioned profits, as found by the master) . . . . . . . . . . . . . . . . . . . . 26,051.82 206,139.15

 (c) Balance of Heftler compensation . . . . . . $ 24,732.06
 Less proportion thereof attributable to profits on miscellaneous parts (on basis of the apportioned profits as found by the master) . . . . . . . . . . . . . . 2,774.93 21,957.13

 (d) Interest on Investment . . . . . . . . . . . . . . . $ 47,441.52
 Less proportion thereof attributable to capital investment in miscellaneous parts . . . . . 3,007.79 44,433.73 795,751.92

Leaving a balance of net profits of . . . . . . . . . . . 331,239.36

Of this balance of net profits the proportion which the Ahara patent contributed, at our estimated percentage of 55.558% is . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 184,029.96

Interest on this amount at 5% per annum from August 22, 1924, to June 28, 1930 . . . . . . . . . . . . . . . . . . . . . . 53,828.70

Amount appellant is entitled to recover . . . . . . . . . . . . . . . . . . . . . 237,858.66

## Order.

The decree is reversed, and the cause is remanded to the District Court with direction to enter a decree in favor of appellant in the sum of $237,858.66, with interest at the rate of 5 per cent. per annum from June 28, 1930, to the date of the entry of the decree, upon the principal sum of $184,029.96; the decree to bear interest at the rate of 5 per cent. per annum from the date of its entry until it is paid; one-half the costs of the accounting herein and of this appeal to be paid by appellant and the other one-half by appellee. Accountants' fees and charges upon the accounting are not to be taxed as costs.

The decree shall provide that the District Court retain jurisdiction of the cause, so that in case the federal income and profits taxes of $160,317.18 for the year ending September 30, 1918, shall have been, or thereafter shall be, reduced or abated, 55.558 per cent. of any such reduction or abatement shall be then decreed to be paid to appellant as further profit, which in such case appellant shall be entitled to recover.