FRANK A. GRANATO *v.* FRANK A. BENETTIERE

APPELLATE DIVISION OF THE CIRCUIT COURT

FILE No. CV 12-6606-7710

Argued November 27, 1967—decided January 5, 1968

*Sebastian A. Intravia,* of East Hartford, for the appellant-appellee (plaintiff).

*Daniel E. Harris,* of Hartford, for the appellee-appellant (defendant).

JACOBS, J.  On April 20, 1966, the plaintiff, hereinafter referred to as the operator, and the defendant, whom we shall refer to as the merchant,[2] entered into a "Location Agreement" by the terms of which the operator agreed "to install in the merchant's place of business located at 421 Main Street, city of East Hartford, Connecticut, a coin operated

---

[2] The terms "operator" and "merchant" appear in the contract. For the sake of clarity, we have followed the language used by the parties and as the same appears in the pleadings.

cigarette vending machine for a period of five years, from April 22, 1966 [to] April 22, 1971." The contract called for payment by the operator to the merchant "for each package of cigarettes sold by the equipment and paid for in legal coin, 5¢ per pack," payable monthly on or before the 25th day of each month. The contract also contained this provision: "It is expressly agreed that in the event the merchant sells his business or assigns his business or disposes of it in some other way, that he will assign this agreement to such purchaser or new owner subject to the approval of the operator. Upon the assumption of this agreement by the new owner, the merchant herein is released from his agreement. If such new owner or purchaser does not wish to continue under the terms of this agreement, such former owner must pay as liquidated damages the average weekly take of the operator as determined by the receipt slips given to the merchant and also by the copies retained by the operator during the term of this agreement, multiplied by the number of weeks left in the term of this agreement, *and this will also apply in the event the merchant breaches his agreement or otherwise removes said operator's equipment from his premises without notice as herein prescribed.*" (Italics supplied.) "The average weekly take" was defined in the contract as "the difference between the net receipts of the operator after subtracting therefrom the wholesale costs of cigarettes and the commission to the merchant." As part consideration for the location agreement, the operator gave the merchant two checks, each dated the same date and each in the sum of $300, one representing a cash payment and the other representing a loan to be repaid to the operator from expected profits.

Within a period of less than a week after the installation of the cigarette vending machine, the

merchant, by his then counsel, notified the operator by certified mail dated April 28, 1966, that "Mr. Frank Benettiere [sic], doing business as Willow Inn of 421 Main Street, East Hartford, Connecticut, . . . is hereby enclosing your checks totaling $600.00 and is requesting that you remove your machine forthwith" for the reason that the merchant had "a prior contractual agreement . . . and is being held to his contract." The "prior contractual agreement" referred to a "Lease Agreement" made and entered into on April 6, 1966, between the merchant and Self Service Sales Corporation, under the terms of which the latter was given "the exclusive right to sell cigarettes by vending machines at the location [421 Main Street, East Hartford] . . . for a period of five years." About a week after the receipt of the letter of April 28, 1966, the operator removed the equipment; meanwhile the vending machine had been "turned around so that it could not be used."

On May 26, 1966, the operator instituted this action against the merchant for alleged breach of the agreement "by permitting the cigarette vending equipment of a competitor of . . . [operator] to be installed and operated on . . . [merchant's] premises, and by . . . ordering . . . [operator] to remove his equipment from the premises forthwith, which was done by . . . [operator] on May 17, 1966."

The trial court found that the merchant had commenced operation of the Willow Inn Restaurant at about the same time he had entered into the contract with the operator, that is, on or about April 20, 1966, and that the merchant had entered into negotiations with a competitor of the operator "a few days prior to April 20, 1966," for "the installation of a cigarette vending machine on the premises of the restaurant." These negotiations ultimately

led to the execution of the contract with the operator's competitor. The court correctly concluded there was a clear breach of contract.

The court was troubled in its attempt to arrive at just damages for loss of expected profits. Measuring unrealized profits entails extensive problems of proof. The court found no comfort in the formula for the ascertainment of damages as contained in the contract because, as it put it, (a) the breach having occurred so soon after the contract was entered into, no past sales record of the machine was available, thus making it impossible to apply the provision for liquidated damages; and (b) to utilize the formula in the contract, but on the basis of a competitor's sales record, would be contrary to public policy because the amount recoverable would constitute a penalty. In our view of this case, under the circumstances as we have recited them, to enforce the liquidated damages provision would place impossible burdens on the operator.

The court proceeded to compute damages in this way: It estimated that the vending machine had a fair potential output capacity of 200 packs of cigarettes a week, thereby giving the operator a gross profit of 10 cents a pack, or $20 a week. The estimated cost of service, insurance, depreciation and other incidentals was computed at $5 a week. Thus, the operator's annual net would amount to $780. The total net over a five-year period of $3900 less the advance payment of $300 which had been returned to the operator left a total net profit of $3600, or an annual profit of $720. The court awarded damages to the operator for a period of two years, a total of $1440, on the ground that this estimate was the most intelligible and probable one permitted by the nature of the case. And, in the exercise of its discretion, the court refused to award

the operator double costs and reasonable attorneys' fees.[3]

By far the most significant question raised by the appeal and the cross appeal which requires our attention is the court's assessment of damages. The merchant on the cross appeal contends that the parties had in their contract liquidated the damages recoverable in the event of his breach; therefore, he argues, damages "must be [awarded] in accordance with the liquidated damages provision in the contract." We cannot agree with this proposition. Expected gains were prevented from accruing by the merchant's wrongdoing; indeed, as we have pointed out, the vending machine had been turned around, so that a meaningful sales record could not be compiled. It was the merchant's conduct which occasioned the breach. "A defendant whose wrongful conduct has rendered difficult the ascertainment of precise damages suffered by the plaintiff will not be heard to complain that they cannot be measured with the same exactness and precision as would otherwise be possible." *Riley* v. *General Mills, Inc.*, 226 F. Sup. 780, 783. "The wrongdoer is not entitled to complain that . . . [damages] cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise." *Story Parchment Co.* v. *Paterson Co.*, 282 U.S. 555, 563. "It should not be forgotten, that any uncertainty resulted from defendant's breach; it would be unfair

---

[3] "Sec. 52-245. FALSE STATEMENT CONCERNING DEFENSE. COSTS. In any case in which an affidavit has been filed by the defendant, or a statement that he has a bona fide defense has been made to the court by his attorney, and the plaintiff recovers judgment, if the court is of the opinion that such affidavit was filed or statement made without just cause or for the purpose of delay, it may allow to the plaintiff, at its discretion, double costs, together with a reasonable counsel fee to be taxed by the court." See also Practice Book § 302, captioned, "Affidavits Made in Bad Faith."

to permit defendant to profit from that uncertainty in the litigation." Comment, "Lost Profits as Contract Damages: Problems of Proof and Limitations on Recovery," 65 Yale L.J. 992, 1003. "Courts should consciously and directly attempt to strike a compromise between the desirability of protecting plaintiff's expectation interest, compensating him fully for losses caused by the breach, and the undesirability of imposing such severe liability that not only breach but also future formation of commercially useful contracts are deterred." Id., p. 1022.

"It has been said that prospective profits, as damages, present one of the most difficult subjects with which courts have to deal." 25 C.J.S. 735, Damages, § 42. "Loss of prospective profits proximately caused by the breach, was, if proven, a proper element of damage." *Stern & Co.* v. *International Harvester Co.,* 148 Conn. 527, 533. "In a case of anticipatory breach such as this, . . . the trier must estimate as best it can what the future situation is likely to be." *Kay Petroleum Corporation* v. *Piergrossi,* 137 Conn. 620, 624; see *Home Pattern Co.* v. *W. W. Mertz Co.,* 86 Conn. 494, 504. "[W]here the existence of a loss is established, absolute certainty in proving its quantum is not required." 1 Sedgwick, Damages (9th Ed.) § 170a; see *Satchwell* v. *Williams,* 40 Conn. 371, 374; 25 C.J.S. 738, Damages, § 42. "In deciding questions of certainty of proof, there seems to be a clearly discernible tendency to treat the problems more and more individually and pragmatically, and not only to insist that the claimant furnish the best available proof of the amount of loss, but also to hold that, if he has furnished the most satisfactory data that the particular situation admits of, this suffices." McCormick, Damages, p. 110. "Obviously, absolute certainty of demonstration that a profit expected in future would have

actually been realized could almost never be attained, and a wrongdoer should not be allowed to insist upon an ideal and impractical standard of proving what would have been the results of an enterprise which his wrong has frustrated. All he can insist upon, and all the law requires is that it be proved, with such certainty as men will act upon in their daily affairs, that a loss has occurred, and that in measuring the loss the court or jury should not resort to a mere guess, but should be guided by some rational *standard*." McCormick, "The Recovery of Damages for Loss of Expected Profits," 7 N.C.L. Rev. 235, 239. "[A]n examination of a large number of the cases, in which claims for lost profits are asserted, leaves one with a feeling that the vagueness and generality of the principles which are used as standards of judgment in this field, are by no means wholly to be regretted. It results in a flexibility in the working of the judicial process in these cases—a free play in the joints of the machine —which enables the judges to give due effect to certain 'imponderables' not reducible to exact rule." Id., p. 248.

In the case at bar, the operator starts with an unchallengeable case of injury, and the damages given in respect to it should be equivalent to the loss. See *Story Parchment Co.* v. *Paterson Co.*, 282 U.S. 555, 562. The court took into account the expenses the operator saved because of the wrongful act of the merchant. These expenses were subtracted from the total amount recoverable. The operator was only entitled to the present value of the net profits, because he was being awarded those profits in advance of the time that he would otherwise have received them. 22 Am. Jur. 2d, Damages, § 178. Overhead items and other costs cannot be easily allocated. The court did its best to estimate

the overhead items as part of the cost of the operation. And the court also considered, and properly so, the fact that the merchant was embarking upon a new business venture, with no past record of profits, so that the chances of failure were perhaps equal to the chances of success. It may well be that the operator made a prudent evaluation of the new enterprise, bearing in mind the character of the business, its location and personnel, and arrived at the conclusion that the chances of successful profit making were much more favorable than the chances of failure. We think the court gave effect to these "imponderables," which are not susceptible of exact calculation, or of mathematical precision, accuracy or nicety. 25 C.J.S. 738, Damages, § 42; see *Sheldon v. Metro-Goldwyn Pictures Corporation,* 106 F.2d 45, 51 (L. Hand, J.).

On the whole, we believe that an award of damages of $1440 represents a reasonable approximation of the operator's projected return. Upon the basis of all the facts and circumstances, probable and inferential, the court gave what it thought to be an adequate solatium under all the circumstances of the case. We cannot say that the court's estimates were incredible.

The denial of the operator's motion for an award of double costs with a reasonable counsel fee (§ 52-245) was within the court's discretion.[4] Its ruling on the motion cannot be disturbed.

We find nothing in any other assignment of error of sufficient substance or materiality to call for consideration.

There is no error.

In this opinion KOSICKI and KINMONTH, Js., concurred.

---

[4] See note 3 supra.